E-FILED
Monday, 20 July, 2020  10:17:31 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |  |
|---|---|---|
| EAST CENTRAL ILLINOIS PIPE TRADES HEALTH & WELFARE FUND & PLUMBERS AND STEAMFITTERS U.A. LOCALS 63;353 PENSION TRUST FUND, | ) ) ) ) ) ) | Case No.  1:18-cv-01434 |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| PRATHER PLUMBING & HEATING, INC., | ) ) ) |  |
| Defendant. | ) |  |

## ORDER & OPINION

Before the Court are the parties' cross-motions for summary judgment. (Docs. 24, 25, 30). The parties have filed their responses (docs. 32, 33) and replies (docs. 34, 35), so this matter is ripe for review. For the following reasons, Plaintiffs' Motion for Summary Judgment (doc. 24) is denied, and Defendant's Motion for Summary Judgment (doc. 30) is granted.

### BACKGROUND[1]

This lawsuit is between Plaintiff East Central Illinois Pipe Trades Health & Welfare Fund and Plaintiff Plumbers and Steamfitters U.A. Locals 63;353 Pension

---

[1] Unless otherwise indicated, the following facts are drawn from the undisputed fact sections of the parties' briefing. This section is meant to provide a general background, while specific facts—particularly several purported factual disputes—will be discussed in the Discussion section, *infra*.

Trust Fund and Defendant Prather Plumbing & Heating, Inc. Plaintiffs seek to hold Defendant liable for a 2013 default judgment entered against a different corporation, Prather Plumbing, Inc. (PPI).

## I.      Prather Plumbing, Inc.

PPI was incorporated in 2004 by Robert (Bob) Prather. David and Kirk Prather, two of Bob's sons, began working for PPI in 2004, and Clinton (Clint) Prather, another of Bob's sons, began working for PPI in 2006. David and Kirk were minority owners of PPI, each owning a 5% ownership interest; Bob owned the remaining 90% ownership interest. David and Kirk relinquished their ownership interests to Bob on June 30, 2012, and received no compensation for the transfer of interest. PPI ceased operations on August 1, 2012. David received paychecks from PPI through July 27, 2012, Kirk received paychecks from PPI through July 6, 2012, and Clint received paychecks from PPI through August 10, 2012.[2]

Shortly after incorporation, PPI signed an agreement with the United Association of Journeyman and Apprentices of the Plumbing and Pipefitters Industry, UA Local 63 (Local 63), in which PPI agreed to be bound by collective bargaining agreements (CBA) between Local 63 and the Mid-Illini Mechanical Contractors Association. On August 22, 2012, Plaintiffs filed a lawsuit against PPI

---

[2] David stated in his deposition he ceased working at PPI on June 1, 2012. (Doc. 25-18). Kirk ceased working for PPI on June 19, 2012. (Doc. 33-3). Clint began working for Defendant in mid-August 2012, and ceased working for PPI prior to that date. (Doc. 30-5). Plaintiffs dispute the admissibility of Docs. 33-3 and 30-5, but as will be discussed, the Court finds it may consider them at summary judgment. Plaintiffs do not identify evidence contradicting these assertions, so the Court deems them admitted. CDIL-LR 7.1(D)(2)(b)(2).

seeking damages for alleged violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* and the Labor and Management Relations Act of 1947 (LMRA), 29 U.S.C. § 141 *et seq. E. Cent. Ill. Pipe Trades Health & Welfare Fund v. Prather Plumbing, Inc.*, No. 12-1309, Doc. 1 (C.D. Ill. Jan. 18, 2013). Plaintiffs alleged PPI failed to make contributions to various funds between January 2008 and December 2011 which were required under the CBAs PPI agreed to via its agreement with Local 63. *Id.* PPI defaulted in that lawsuit, resulting in a judgment in the amount of $293,183.06 (excluding attorney's fees and costs). *Id.,* Doc. 11.

## II.     Prather Plumbing & Heating, Inc.

In early 2012, David began looking for more steady work. He interviewed with other companies but ultimately decided to start his own plumbing business. On May 30, 2012, David incorporated Defendant Prather Plumbing & Heating, Inc. David is its sole owner and serves as President, Kirk and Clint serve as Vice Presidents, and David's wife, Tara Prather, serves as Secretary and Treasurer.

In June and August 2012, Defendant purchased certain assets which were previously owned by PPI. On June 19, Defendant purchased from Morton Community Bank a 2005 truck for $10,000, a used white trailer for $1,200, power tools and ladders for $4,044, and some used hand tools for $280. On August 13, Defendant purchased from Morton Community Bank a 2004 truck for $7,500 and a black trailer

for $1,000. And on or around August 24, Defendant bought a 1997 truck for $1,000.[3] Additionally, between July and September 2012, Defendant subcontracted work from PPI and invoiced PPI for that work.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmovant bears the burden of demonstrating that such a genuine issue of material fact exists." *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018). The parties must support their assertions that a fact is disputed or cannot be genuinely disputed by citing to admissible evidence in the record. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).

The record is viewed in the light most favorable to the nonmovant, and the Court must draw all reasonable inferences from the evidence in the nonmovant's favor. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 536 (7th Cir. 2018). When presented with cross-motions for summary judgment, the Court must consider the motions separately, which necessarily means the nonmovant differs

---

[3] It is unclear from whom Defendant purchased the 1997 truck on August 24, 2012. (*See* docs. 30-2 at 6; 32 at 6).

depending on the motion being considered. *See Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). This, however, does not alter the standard for reviewing a motion for summary judgment or the parties' respective burdens.

### DISCUSSION

At the center of this lawsuit is a default judgment establishing PPI's liability for unpaid contributions to two multiemployer benefits funds.

> Multiemployer pension plans are based on defined contributions and pay defined benefits. If one employer defaults on its contributions, whether by delinquency or withdrawal, other employers must make up the difference to cover the defined benefits owed to participants. Unpaid contributions also result in the loss of investment income that could have been earned by the plan. Both types of losses put financial pressure on the remaining employers and discourage new employers from joining. The financial stability of the plan is put in jeopardy, and plan beneficiaries risk losing their pension benefits.

*Ind. Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 775 (7th Cir. 2018) (*Ind. Elec.*) (internal citations omitted). "Successor liability may be imposed to prevent other employers from having to make up the difference left by employers who have left the fund without paying their liabilities but whose businesses continue." *Id.* at 776 (citation omitted). That is what Plaintiffs hope to accomplish in this lawsuit.

Both sides claim entitlement to summary judgment on the substantive issue of successor liability. Defendant also seeks summary judgment on the issues of subject matter jurisdiction and standing. The Court will address the justiciability matters before turning to the parties' respective positions on the substantive issue.

## I.    Subject Matter Jurisdiction

Defendant first seeks summary judgment on the issue of subject matter jurisdiction.[4] Relying on *Peacock v. Thomas*, 516 U.S. 349, 357–60 (1996), Defendant argues the Court lacks subject matter jurisdiction over Plaintiffs' claim because (1) Defendant was not party to the default judgment against PPI and (2) Plaintiffs have not alleged Defendant was directly liable for the alleged ERISA violation(s) giving rise to the default judgment against PPI. (Doc. 30 at 28–32).

Plaintiffs argue successor liability—a federal common law doctrine—permits enforcement of a federal judgment against a successor entity in limited situations. (Doc. 32 at 33–35). Plaintiffs urge successor liability applies here because Defendant, the successor, had "prior notice of the liability in question" and there is "sufficient evidence of continuity of operations between the predecessor and successor." (Doc. 32 at 33) (quoting *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990) (*Artistic Furniture*)).

In *Peacock*, the plaintiff, Thomas, obtained a judgment for benefits due under an ERISA plan against his former employer, Tru-Tech; Thomas was unable to collect the judgment from Tru-Tech, so he sued Peacock, an officer and shareholder of Tru-

---

[4] The proper vehicle to challenge a court's subject matter jurisdiction is a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). To the extent a jurisdictional challenge relies on factual assertions, "a defendant challenging jurisdiction need not accept as true the allegations in the complaint and may ask the court to decide the jurisdictional issue by considering additional documents and affidavits, which makes the motion look a lot like a summary judgment motion, or by holding an evidentiary hearing and making factual findings." *Chi. Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 814 (7th Cir. 2018) (citation omitted). The instant jurisdictional issue, however, is a question of law, as will be discussed *infra*; the Court, therefore, need not look outside the Complaint to resolve the issue.

Tech, in federal court to collect the ERISA judgment by piercing the corporate veil. *Peacock*, 516 U.S. at 351–52. Thomas claimed Peacock conspired to siphon assets from the company in violation of state law to prevent satisfaction of Thomas' ERISA judgment. *Id.* at 352.

The Supreme Court determined the district court lacked subject matter jurisdiction over the subsequent lawsuit against Peacock. *Id.* at 354. First, the Court could not identify "any provision of ERISA that provides for imposing liability for an extant ERISA judgment against a third party;" the provision permitting "appropriate equitable relief," 29 U.S.C. § 1132(a)(3), only permits "appropriate equitable relief for the purpose of redress[ing any] violations or . . . enforc[ing] any provisions of ERISA or an ERISA plan." *Peacock*, 516 U.S. at 353 (internal quotation marks omitted and alterations in original). Second, the veil-piercing claim—a state law claim—did "not state a cause of action under ERISA and cannot independently support federal jurisdiction." *Id.* at 353–54. "Even if ERISA permits a plaintiff to pierce the corporate veil to reach a defendant not otherwise subject to suit under ERISA, Thomas could invoke the jurisdiction of the federal courts only by independently alleging a violation of an ERISA provision or term of the plan." *Id.* at 354. Finally, the Court determined ancillary jurisdiction did not lie. "We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Id.* at 357. Indeed, ancillary judgment is discouraged where the subsequent proceeding is "entirely new and original" or where "the relief [sought is] of a different kind or on a different

7

principle than that of the prior decree." *Id.* at 358 (internal quotation marks omitted and alterations in original).

The takeaway from *Peacock* is subject matter jurisdiction does not automatically lie in "a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Id.* at 357. There must be a basis for subject matter jurisdiction independent of the prior federal judgment.

The Supreme Court has long recognized 28 U.S.C. § 1331 confers subject matter jurisdiction over "claims founded upon federal common law as well as those of a statutory origin." *Illinois v. City of Milwaukee, Wis.*, 406 U.S. 91, 100 (1972). The doctrine of successor liability developed as an exception to a federal common law rule: "a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities." *Artistic Furniture*, 920 F.2d at 1325 (quoting *Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir. 1977)). Plaintiffs' claim for successor liability thus arises under federal law, not state law.[5]

---

[5] Additionally, other courts have persuasively held a claim to impose successor liability—which, at its core, is based on the premise that the successor entity is merely a continuation of the predecessor—is a claim for direct liability under ERISA, which would give rise to subject matter jurisdiction under the ERISA jurisdictional provision, 29 U.S.C. § 1132(e)(1). *E.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. B&M Marine Constr., Inc.*, No. 16-CV-2743, 2018 WL 318483, at *4–*5 (N.D. Ill. Jan. 8, 2018) (citing *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000) (holding an allegation that corporation A is corporation B's alter ego is a claim for direct, not vicarious, liability)). At any rate, Plaintiffs' claim clearly arises under federal common law.

The Complaint alleges Defendant's officers had notice of PPI's liabilities, including the ERISA liability underlying the 2013 default judgment, and Defendant is essentially a continuation of PPI. (Doc. 1 at 4–6). These allegations are sufficient to invoke the Court's subject matter jurisdiction under § 1331. *See Ind. Elec.*, 884 F.3d at 774–75 ("Successor liability is an equitable doctrine and is imposed when there exist sufficient indicia of continuity between the two companies and . . . the successor firm had notice of its predecessor's liability." (internal quotation marks omitted and alteration in original)); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006) ("A plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States.").

The Court therefore concludes there is a basis for subject matter jurisdiction independent of the ERISA judgment Plaintiffs seek to hold Defendant liable for: federal question jurisdiction as to whether successor liability is warranted.

## II.  Article III Standing

Defendant next challenges Plaintiffs' standing to collect ERISA damages on behalf of eleven funds/entities which are not party to this action and were not party to the PPI lawsuit; this standing challenge is made to both the default judgment lawsuit and the instant matter. (Doc. 30 at 32–36).

"Article III of the Constitution limits the power of federal courts to deciding 'cases' and 'controversies.' " *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 382 (7th Cir. 2020) (*Bria*). The burden of establishing Article III standing rests with the plaintiff. *Id.* "She must allege and prove (1) a concrete and particularized injury, (2) caused by the actions of the defendant, (3) that would likely be redressed by a

favorable decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The general rule is that plaintiffs must allege their own injuries to establish standing." *Id.* at 384 (citing *Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013) ("[M]ere authorization to represent a third party's interests" will not confer standing to a party with no injuries of her own.)).[6] "If the plaintiff lacks standing, the federal court lacks subject matter jurisdiction and the suit must be dismissed." *Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017).[7]

### A. Instant Lawsuit

Contrary to Plaintiffs' claim (doc. 32 at 37), Defendant absolutely has the right to challenge Plaintiffs' standing in the instant lawsuit irrespective of any admissions by PPI in the prior lawsuit. Plaintiffs' standing argument appears to rest on the assumption this lawsuit is merely a continuation of the lawsuit against PPI. That assumption is incorrect. However, even assuming, arguendo, the instant lawsuit was a continuation of the PPI lawsuit, standing must exist at all stages of litigation. *Hollingsworth*, 570 U.S. at 705 And, as Defendant notes, default results in the admission of the complaint's allegations against the defaulting party, not unnamed, non-defaulting parties. *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016) (quoting 10 James W.M. Moore, et al., Moore's Federal Practice § 55.32[1][a] (3d ed. 2013) ("The effect of an entry of default, if not set aside, is to

---

[6] There are exceptions to this general rule. *Bria*, 950 F.3d at 384. As relevant here, "the Supreme Court suggested that an agency relationship combined with authorization by the principal could establish representative standing." *Id.* at 385 (citing *Hollingsworth*, 570 U.S. at 713–14).

[7] As standing goes to the Court's subject matter jurisdiction, the proper vehicle for this challenge is, again, Rule 12(b)(1).

establish the liability of the defaulting party as a basis for default judgment.")). Defendant—a nonparty to the PPI lawsuit, who therefore could not have defaulted therein—has not admitted Plaintiffs' standing is sound. In sum, there is simply no basis on which to assume the default judgment against PPI automatically confers Article III standing in this case.

The default judgment Plaintiffs seek to enforce in the instant lawsuit states:

> IT IS ORDERED AND ADJUDGED that Default Judgment is entered in favor of Plaintiffs and against Defendant. Defendant is ordered to pay to Plumbers & Pipefitters Local 65/353 Pension Fund as follows: $125,287.03 for fringe benefit contributions, $39,071.22 in interest, $13,775.81 in liquidated damages and $690.00 in audit costs. Defendant is further ordered to pay to East Central Illinois Pipe Trades Health & Welfare Fund as follows: $103,294.55 for fringe benefits contributions, $10,329.45 in liquidated damages and $735.00 in audit costs. Additionally, Defendant is ordered to pay $5,575.50 in attorneys' fees and $378.50 in costs.

*E. Cent. Ill. Pipe Trades Health & Welfare Fund v. Prather Plumbing, Inc.*, No. 12-1309, Doc. 11 (C.D. Ill. Jan. 18, 2013). The judgment—and thus the right to collect it—belongs solely to the named plaintiffs in this case: East Central Illinois Pipe Trades Health & Welfare Fund, Plumbers and Steamfitters U.A. Locals 63;353 Pension Trust Fund.

All elements of standing are evident on the face of the Complaint and persist. *See Bria*, 950 F.3d at 382. Certainly, Plaintiffs can assert their own rights in this lawsuit, meaning they can sue Defendant to collect a judgment belonging to them; Defendant does not argue otherwise. Because the PPI default judgment belongs to the two named Plaintiffs and not to the eleven unnamed funds/entities, Defendant's standing argument as it relates to the instant lawsuit fails.

B.    *Prior Lawsuit Against PPI*

Defendant's argument as to Plaintiffs' lack of standing to assert the rights of the unnamed funds/entities in the PPI lawsuit goes to the validity of the judgment entered in that suit. Collateral attacks on a prior judgment are permissible in certain situations. *See* Fed. R. Civ. P. 60(b)(4), (6); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153 (2009) (suggesting a judgment may be collaterally challenged as void where the challenger did not have a previous opportunity to challenge the rendering court's subject matter jurisdiction); *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 598 (7th Cir. 2007) (noting default judgments entered without jurisdiction must be set aside). *But see* 35B C.J.S. Federal Civil Procedure § 1154; *United States v. Tittjung*, 235 F.3d 330, 335 (7th Cir. 2000) (noting a judgment entered without subject matter jurisdiction does not automatically permit relief under Rule 60(b)(4)). However, the validity of the judgment against PPI only becomes an issue if Defendant is adjudicated PPI's successor; put another way, if Defendant is not adjudicated PPI's successor, Defendant has no reason—indeed, no right—to contest the judgment against PPI. The Court is secure in its jurisdiction to decide whether Defendant is PPI's successor and therefore may make that determination.

## III.   **Successor Liability**

As previously stated, generally "a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities." *Artistic Furniture*, 920 F.2d at 1325 (quoting *Travis*, 565 F.2d at 446). The successor liability doctrine, however, is an exception to that general rule and applies when "an employer  .  .  .  substantially assumes a predecessor's assets, continues the

predecessor's operations without interruption or substantial change, and . . . has notice [of the liability] at the time of acquisition." *Ind. Elec.*, 884 F.3d at 776 (quoting *Artistic Furniture*, 920 F.2d at 1326) (alteration in original).

> The entire issue of successor liability . . . is dreadfully tangled, reflecting the difficulty of striking the right balance between the competing interests at stake. In favor of successor liability is the interest in preventing tortfeasors from externalizing the costs of their misconduct by selling their assets free of any liabilities and distributing the proceeds to their shareholders. Against is the interest in a fluid market in corporate assets, which is impeded if purchasers acquire along with the assets legal liabilities of unknown, sometimes unknowable, dimensions. The latter consideration dominated common law thinking until recent years, producing a rule, now eroding, that in a sale of assets . . . as distinct from a merger or consolidation, the purchaser took free of any liabilities not expressly assumed, including tort liabilities.

*Bd. of Trs. of Auto. Mechs. Local No. 701 Union & Indus. Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 996 (7th Cir. 2016) (quoting *EEOC v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988)) (alterations in original).

The present matter presents a two-pronged inquiry. First, would imposition of successor liability on Defendant be equitable? If so, did "the successor ha[ve] notice of the claim before the acquisition," and was there "substantial continuity of operation of the business before and after the sale"? *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 357 (7th Cir. 2014). In approaching these questions, the parties raise certain evidentiary objections, which must be resolved before turning to the legal issues.

A.    *Evidentiary Objections*

Plaintiffs object to Defendant's use of declarations, as opposed to affidavits, in support of Defendant's Motion for Summary Judgment and in opposition to Plaintiffs'

13

Motion for Summary Judgment. (*See* doc. 32 at 8). Specifically, Plaintiffs argue Federal Rule of Civil Procedure 56(e) requires citation to admissible evidence, which they read to mean affidavits; because Defendant's declarations do not meet the requirements to be considered affidavits under Federal Rule of Evidence 902(8), Plaintiffs argue the declarations are inadmissible and cannot be considered. (Doc. 32 at 8).

However, Rule 56(c)(4) explicitly contemplates use of affidavits *or* declarations to support or refute factual assertions at the summary judgment stage. In speaking on the use of declarations at summary judgment, the Seventh Circuit held:

> [The plaintiff] verified his response in opposition to the defendants' motion for summary judgment, and that was enough to make his allegations admissible. As the district court noted, [the plaintiff's] submission was not literally an 'affidavit' because he did not swear to the content in the presence of someone authorized to administer oaths. Nevertheless, a declaration under [28 U.S.C.] § 1746 is equivalent to an affidavit for purposes of summary judgment.

*Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011). Defendant explicitly states its declarations are made under § 1746; it does not purport to offer affidavits under Rule 902(8). As Plaintiffs identify no other ground on which to challenge the admissibility of the declarations, the Court will consider them.[8]

Defendants challenge Plaintiffs' reliance on their Exhibit EE (doc. 33-6), a June 8, 2012, certified letter from Patrick Ryan (one of Plaintiffs' attorneys not involved in this action) to David indicating PPI was delinquent on his pension contributions. Per Defendant, the letter should have been disclosed in response to

---

[8] Moreover, per Rule 56(c)(2), the party need only show the relied-upon evidence could be presented in admissible form, such as live testimony.

14

their first set of interrogatories, yet the letter was not disclosed or produced until two weeks after fact discovery had closed; this, Defendant argues, prevented it from deposing Patrick Ryan. (Doc. 33 at 67–68, 73–74). Accordingly, Defendant argues the letter should be considered inadmissible. (Doc. 33 at 73–74).

Plaintiffs maintain any delay in disclosing and producing the letter was inadvertent and not in bad faith. (Doc. 34 at 11–12; 16–17). The existence of the letter was hinted at in an October 30, 2019, deposition, and Plaintiff's' attorney inquired into the matter and turned over the letter on November 14, 2019, the same day it was received by Plaintiffs. (Doc. 34 at 11–12). Plaintiffs argue against a finding of inadmissibility, pointing out Defendant's failure to ask to depose Patrick Ryan, to extend discovery based on the letter, or to otherwise object to the supplemental disclosure; further, Plaintiffs note they have agreed to extensions of discovery and motion deadlines throughout this case. (Doc. 34 at 14, 16–17).

The Court finds Defendant has not been unduly prejudiced by the untimely disclosure and production of the letter, which was produced only fourteen days after fact discovery had closed but while expert discovery was ongoing (*see* doc. 19). Defendant has had ample time to cure any prejudice to it by either moving under Federal Rule of Civil Procedure 37 or seeking permission to depose Patrick Ryan; it chose not to. Moreover, Defendant makes a cogent argument to mitigate any weight to be afforded to the letter (doc. 33 at 3, 74), meaning Defendant was clearly able to formulate a response to the evidence. For these reasons, the Court finds the untimely production of the June 8, 2012, letter harmless and will consider it.

B.    *Equity*

"[S]uccessor liability is an equitable doctrine, not an inflexible command, and in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 848 (7th Cir. 2015) (internal quotation marks omitted). When at issue, it behooves courts to address equity at the outset, as regardless of whether elements of successor liability are ultimately proven, successor liability will only be imposed where equitable.

Defendant seeks summary judgment on the issue of equity (doc. 30 at 48–49) and opposes Plaintiffs' Motion for Summary Judgment on equity grounds (doc. 33 at 88–89). Defendant contends inequity would result from a decision imposing a $293,183.06 judgment against it based solely on the acquisition of a relatively small amount of physical assets previously owned by PPI. (Doc. 30 at 48–49). Defendant distinguishes this case from *Ind. Elec.*, which involved significant policy concerns due to the nature of withdrawal liability; this case, by contrast, involves delinquent contributions. (Doc. 30 at 48). Defendant further argues Plaintiff Welfare Fund "received the full cost to the fund of supplying coverage to PPI's employees—by virtue of PPI making payments upon the individual Prathers being issued notices of deficiencies and invoices." (Doc. 30 at 48).

Plaintiffs do not specifically respond to Defendant's request for summary judgment on the issue of equity (*see* doc. 32), thus waiving any defense they might

16

have thereto, *Gibbons v. Mony Life Ins. Co.*, 760 F. App'x 444, 447 (7th Cir. 2019) ("[A]rguments not made in response to summary-judgment motions are waived."). The Court does note, however, Plaintiffs' Reply (doc. 34) in the briefing on their Motion for Summary Judgment does respond to Defendant's equity argument opposing summary judgment in Plaintiffs' favor. There, Plaintiffs accuse the Prathers of using "self-payments to circumvent PPI's obligation under its collective bargaining agreement, which allowed the Prathers and their families to receive medical coverage." (Doc. 34 at 20). Plaintiffs also suggest the fact Bob Prather is drawing a pension "despite the delinquencies and the breach of the settlement agreement with the Pension Fund" demonstrates the equities lie in their favor rather than Defendant's. (Doc. 34 at 20). Finally, Plaintiffs invoke the very purpose of successor liability: where a successor has notice of the predecessor's liability and there is continuity of operations, imposition of successor liability is appropriate for "the vindication of important federal statutory policy." (Doc. 34 at 20).

In the Court's view, this case presents a close call on whether successor liability may be imposed at all; there are strong arguments supporting both positions. Nevertheless, the Court finds imposition of successor liability—regardless of whether the elements of notice and continuity have been met—would be inequitable. Several factors, some relating to the elements of notice and continuity, have guided this decision.

The types and number of assets purchased by Defendant demonstrates equity lies on Defendant's side. Defendant paid a total of $25,024 to purchase three older

17

trucks and two used trailers, used hand and power tools, and ladders. (Doc. 32 at 6). Critically, Defendant did not purchase *any* intangible assets such as customer lists, trademarks, accounts receivable, etc. (Doc. 30-2 at 6). Though the Court lacks specific evidence of how PPI was wound down, it is clear Defendant did not purchase all of PPI's assets (*see* docs. 25 at 10; 33 at 11; 25-21 at 10), which weighs against imposition of successor liability. *Teed v. Thomas & Betts Power Sols., L.L.C.*, 711 F.3d 763, 768 (7th Cir. 2013) ("[F]or when a company is broken up and its assets sold piecemeal, there is no successor to transfer the company's liability to.").

Additionally, Plaintiffs fail to explain how PPI's prior ownership of any items purchased by Defendant was in any way significant to Defendant; Plaintiffs merely argue these purchases allowed Defendant "to immediately begin operations" (docs. 25 at 26; 32 at 42). Nothing in the record suggests any of these items were unique such that they allowed Defendant to "carry on the Prather family business." *Contra Ind. Elec.*, 884 F.3d at 779 (noting the successor purchased the predecessor's tangible and intangible assets for the purpose of continuing the predecessors' brand name and utilizing its goodwill and reputation). Nor could they reasonably be expected to appreciate or correlate to a larger bottom line. As PPI's prior ownership of the items holds no significance, the items could have easily been purchased elsewhere. So, it reasonably follows Defendant could have immediately began operations regardless of whether it purchased items previously owned by PPI.

The method of purchase likewise supports Defendant's position. Most if not all the PPI assets acquired by Defendant were purchased from Morton Community

Bank, which is strongly indicative of an arms-length transaction and maintenance of separate corporate identities as opposed to a sweetheart deal between family members. Indeed, if Defendant were truly just a continuation of PPI, it could have simply taken the assets and taken over any respective notes PPI owed to the bank. In that same vein, while Defendant's subcontracting work for PPI can certainly be argued to support both positions, the fact Defendant subcontracted for PPI, rather than simply assume PPI's role, demonstrates maintenance of separate corporate identities.

The issue of notice, however, appears to weigh in favor of Plaintiffs. The Seventh Circuit has proven willing to impute knowledge of liabilities from the knowledge contributions are required, particularly in cases involving transfers between family members. *See, e.g.*, *Bd. of Trs. of Auto. Mechanics' Local No. 701 Union & Indus. Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 996–97 (7th Cir. 2016) (*Auto Mechanics*) (finding knowledge the predecessor was required to contribute to a pension fund essentially created a duty to inquire into the possibility of withdrawal liability). Though the Prathers deny any knowledge of outstanding liabilities, the Court need not rely on solely imputation of knowledge here. Plaintiffs point to the Patrick Ryan letter as its smoking gun. The letter, dated prior to the first purchase of assets, informed David pension contributions on his behalf as a PPI employee were delinquent; it warned he would not receive certain pension credits if the liabilities were not paid. (Doc. 33-6 at 5). While the letter did not allude to the full extent of PPI's liabilities, it appears sufficient to put David on notice of possible

outstanding liabilities under Seventh Circuit precedent, at least to the extent summary judgment could not be entered in Defendant's favor on the issue of notice. *See Tsareff*, 794 F.3d at 847–48 (finding sufficient notice where the successor was aware of the obligation to contribute to a pension fund and acquisition documents mentioned some outstanding pension liabilities); *Auto Mechanics*, 826 F.3d at 997 ("[The son/purchaser] may never have heard of withdrawal liability or known that the union pension fund was underfunded . . . , but knowing that he was dealing with a union pension fund he was on notice that there was a possibility of such liability."); *Cent. States, Se. v. Sidney Insulation, Inc.*, 235 F. Supp. 3d 1044, 1051–52 (N.D. Ill. 2017) (*Sidney Insulation*) (disregarding the daughter's contention she was unaware of the liability at issue and imputing such knowledge to her). Plaintiffs' argument the Prathers' use of self-payments demonstrates the equities lie in in their favor also seems to go to the issue of notice. It is otherwise unclear how PPI's failure to meet obligations under the CBAs and the Prathers' alleged use of self-payments to cure such failures demonstrate it is equitable to hold Defendant liable for PPI's errors.

The fact both PPI and Defendant are family businesses is a somewhat neutral factor in this equation. Plaintiffs repeatedly argue throughout this matter Defendant assumed PPI's identity through its name, business, and workforce. Certainly, the names are similar: Prather Plumbing, Inc., and Prather Plumbing and Heating, Inc. In this instance, however, the Court does not find the similarity a strong indication of succession; the business names simply incorporate the type of business the companies respectively engage in and the owners' last names, which happen to be the

same because they are family. And while the work performed by the two companies was similar in that both companies provided plumbing services, Defendant performs work PPI did not, such as HVAC work, site work, and heavy commercial work.[9] Additionally, both companies' use of the Center Street building does not weigh in favor of Plaintiffs. David's declaration indicated at the time both companies were in operation, they rented separate parts of the building from a third party; moreover, during that time, neither advertised or otherwise held out the Center Street space as their business location.[10] (*E.g.*, doc. 30-2 at 6–7). That they both rented what was seemingly separate storage spaces in the same building does not necessarily demonstrate continuity of business.

The similarity in workforce is likewise somewhat neutral. Again, the similarities in workforce is unsurprising given David started a business performing similar work to PPI and offered leadership roles to his brothers, who he had worked with for years. However, Defendant employs far more employees than PPI did at the time David branched out, and most of its employees never worked for PPI.[11] And

---

[9] Plaintiffs dispute this statement of fact, arguing: "The Statements are mere argument and are improper for a Statement of Facts section." (Doc. 32 at 23). The Court disagrees; stating the types of work performed and not performed by PPI and Defendant are statements of fact, not argument. And as Plaintiffs fail to cite to any evidence refuting these statements, the Court deems them admitted. CDIL-LR 7.1(D)(2)(b)(2).

[10] Plaintiffs dispute this fact solely by arguing David Prather's declaration is inadmissible; having found it admissible and considering Plaintiffs do not cite any evidence to the contrary (doc. 32 at 22–23), the Court deems this fact admitted. CDIL-LR 7.1(D)(2)(b)(2).

[11] Only four former PPI employees ended up working for Defendant: the three Prather brothers and their cousin, Jared Folkerts, who worked for PPI as a part-time stock/shop hand while in school. (Doc. 30-2 at 7). Plaintiffs disputed the paragraph

critically, Bob Prather—the majority owner of PPI—was never an employee of Defendant's and did not advise or assist David with Defendant's start-up.[12] (Doc. 25-1 at 58–59). As Bob is not an employee of Defendant, the fact he is collecting a pension does not demonstrate the equities lie with Plaintiffs when it comes to imposing PPI's liabilities on Defendant, particularly because Defendant is not unionized and its employees, therefore, no longer enjoy any of the health insurance or pension benefits provided by Plaintiffs. So, it is not as if Defendant stepped into PPI's shoes, reaping the benefits provided by Plaintiffs but without covering PPI's liabilities.

Viewing the evidence, the Court sees a son, unhappy with his career at his father's business, who branched out and started his own enterprise, not a father who groomed a son to take over the family business under a different name. (*See* docs. 25-17 at 58–59; 30-2 at 3). *Contra Sidney Insulation*, 235 F. Supp. 3d at 1051–54 (finding successor liability equitable because of the clear evidence indicating a daughter was taking over her father's business and she had clear notice of liability and there was continuity of operations); *Auto Mechanics*, 826 F.3d at 995–96 (suggesting successor liability was appropriate where a son formed a new company, purchased his father's company's assets, assumed two of his father's company's leases, and hired an entire cohort, if not all, of his father's company's workforce). Unlike in *Sidney Insulation*

---

this factual assertion appeared in, arguing in relevant part David Prather's declaration (doc 30-2) is inadmissible. (Doc. 32 at 15–16). Having found it admissible and considering Plaintiffs' failure to cite evidence contradicting the assertion (doc. 32 at 3–4), the Court finds this fact admitted. CDIL-LR 7.1(D)(2)(b)(2).

[12] Though, Bob did clean Defendant's shop as an independent contractor at one point. (Doc. 32-2 at 2–3).

and *Ind. Elec.*, where the successor corporations expressly held themselves out as continuations of the predecessor corporations, David has taken no action to hold out Defendant as a continuation of PPI (doc. 30-2 at 5) and Bob was not involved in Defendant's startup (docs. 25-17 at 58–59; 30-2 at 2–3).[13] This cuts against imposing successor liability.

Perhaps most importantly, the Court sees a grave inequity in imposing a judgment of nearly $300,000 due solely to the purchase of only $25,024 in physical, depreciating assets, "for if no assets are bought, no liabilities are assumed," *Auto Mechanics*, 826 F.3d at 997. The bottom line is: Defendant made a modest purchase of generic, used tools and equipment previously owned by PPI, the likes of which could have easily been purchased elsewhere. Imposition of liability for a judgment more than nine times the value of the purchases from which the liability flows is immensely inequitable, particularly when Defendant has clearly taken measures to maintain a wholly separate corporate identity from PPI. As the equities weigh against imposing successor liability, the Court's inquiry need not proceed further; Plaintiffs' lawsuit cannot succeed.

---

[13] Plaintiffs object to these facts as "argumentative" and "inadmissible" (doc. 32 at 18–19); the Court disagrees and, as Plaintiffs cite to no evidence to the contrary, deems them admitted. CDIL-LR 7.1(D)(2)(b)(2).

CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (doc. 30) is GRANTED and Plaintiffs' Motion for Summary Judgment (doc. 24) is DENIED. This matter is TERMINATED.

SO ORDERED.

Entered this 17th day of July 2020.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge